**SCHERING CORPORATION and Key Pharmaceuticals, Inc., Plaintiffs,**

v.

**VITARINE PHARMACEUTICALS, INC. and Major Pharmaceuticals Corp., Defendants.**

Civ. A. No. 88–4046.

United States District Court,
D. New Jersey,
Civil Division.

March 10, 1989.

As Amended March 22, 1989.

---

Hellring, Lindeman, Goldstein, Siegal, Stern & Greenberg, P.C., Newark, N.J. by Jonathan L. Goldstein, Milgrim, Thomajan & Lee, P.C., New York City by Alfred T. Lee, Samuel D. Rosen, Emil Scheller, Schering Corp., Kenilworth, N.J., for plaintiffs.

Budd, Larner, Gross, Picillo, Rosenbaum, Greenberg & Sade, P.C., Short Hills, N.J.

by Robert Novack, Lord, Day & Lord, Barrett Smith, New York City by William O. Purcell, John Sullivan, for defendants.

### OPINION

BARRY, District Judge.

On September 16, 1988, counsel for plaintiffs Schering Corporation and Key Pharmaceuticals and counsel for defendants Vitarine Pharmaceuticals and Major Pharmaceuticals appeared in my chambers on plaintiffs' application for an order to show cause. Plaintiffs' complaint sought, *inter alia,* injunctive relief as to two claims: first, advertisements falsely claiming that Murray Drug Corporation's 100 and 200 mg. Inwood theophylline was bioequivalent to plaintiffs' Theodur theophylline[1] and, second, the "billboarding," in Murray's advertisements, of the Theodur name and mark, in prominent size and color, and the use of misleading "compares to" and "competes with" claims. *See* Complaint ¶¶ 9–27. Plaintiffs asserted the former claims pursuant to 15 U.S.C. § 1125(a) and the latter claims pursuant to 15 U.S.C. § 1114(a) and, as to both claims, sought a prompt hearing and expedited discovery. Significantly, paragraph 21 of the complaint, presented to me in chambers that day, stated that "[d]efendants' aforesaid acts have caused and, unless enjoined by this Court, will continue to cause ... present hazards to the public, for which there is no adequate remedy at law." Plaintiffs' memorandum in support of the order to show cause emphasized the "paramount public interest factor" warranting injunctive relief (p. 8), i.e. the "clear risk to patients" (p. 5), the "risk of harm to the public" (p. 6), and the "hazards defendants' acts cause for patients...." (p. 9).

The recollections of the parties differ as to what was said at the conference of September 16, which, unfortunately, was not transcribed. As relevant here, they disagree as to what was said by plaintiffs' lead counsel, Samuel D. Rosen, Esq., regarding the health risk posed by the substitution of Inwood theophylline for Theodur in the 100 and 200 mg. strengths. John Sullivan, Esq., one of defendants' counsel, recalls that Rosen asserted the presence of a "serious risk to public health," and that he posed the possibility of ordering the product (Inwood 100 and 200 mg. theophylline) to be removed from the marketplace. Sullivan Aff., ¶ 3. Rosen contends that he made no representation that defendants' product posed "an imminent health danger or any risk more severe or pronounced than the general risk described in the [medical] literature." Rosen Aff., ¶ 8. He asserts that he limited his argument before me to the claim that any substitution of one theophylline product for another, absent bioequivalence, "present[ed] a potential health risk," and that he did not intimate that substitution of defendants' product for Theodur "would, in fact, injure the patient." *Id.* ¶ 9. Moreover, Rosen claims that he did not suggest that a recall of defendants' products would be necessary. *Id.* ¶ 12.

Whatever the precise assertions, and more will be said about those later, it was made absolutely clear to me that if I did not act, and act immediately, trouble—real trouble—loomed ahead for any patient subjected to a substitution of defendants' product for Theodur in the 100 mg. and 200 mg. dosages. Rosen thus invested his application with an importance and an urgency which would prove to be wholly unwarranted by the facts.

Following the arguments of counsel, I set down October 24 as the hearing date on plaintiffs' application, with submissions of briefs by October 17, and informed counsel that they were to petition the Honorable Stanley R. Chesler in the event that expedited discovery could not be agreed upon by the parties. The October 24th date was set only because of the potential health risk, for I was aware that I would be and, indeed, I was in the midst of a lengthy and important criminal trial on that date.

---

1. Defendants have submitted a pharmaceutical trade publication which states that, as of January 25, 1989, Inwood's theophylline (referred to as "Theocron") has been rated by the F.D.A. as bioequivalent to Theodur in the 100 and 200 mg. strengths. *See* Schneiderman Aff., Exh. D. The F.D.A.'s finding of bioequivalence, while legally irrelevant to the issue before me, validates, albeit in retrospect, the safe substitution of plaintiffs' product with defendants' product.

On September 23, 1988, counsel appeared before Magistrate Chesler on plaintiffs' application for expedited discovery. Although the expedited discovery was granted, the parties again disagree as to the Magistrate's reasons for ordering that discovery. Defendants maintain that the hearing before Magistrate Chesler one week following the filing of the complaint and the expedited discovery ordered on that date were the result of representations by plaintiffs' counsel of serious danger to the public health from substitution of Inwood theophylline for Theodur. *See* Defendants' Memorandum of Law in Support of Motion for Sanctions at 3; Rosen Aff., Exh. 8, at p. 7 (letter from William Purcell, Esq. to Magistrate Chesler, dated October 12, 1988). Plaintiffs contend that, as before me on September 16, nothing was said regarding "any actual harm emanating specifically from defendants' products." Rosen Aff., ¶ 17. Accordingly, their argument goes, expedited discovery was ordered not on the basis of any perceived health threat, but rather so that plaintiffs could obtain discovery, in time for the October 24 hearing, of defendants' purported defenses to plaintiffs' application. *Id.*, and ¶ 32.

The parties thereupon commenced what I later described as "extraordinar[ily] expedited discovery." Transcript of Hearing of October 24, 1988 (hereinafter "Hearing") 3:18–19. This discovery involved two in-person conferences before Magistrate Chesler, on September 16 and October 11, and at least six phone conferences, on September 28, October 5, October 6, October 14, October 20, and one undated conference. *See* Rosen Aff., ¶¶ 46, 48, 51, 61, 63, 87–89; Purcell Aff., ¶¶ 5, 8, 12, 14. Moreover, at least five depositions were conducted (those of Emil Scheller, Fred Bondy, James Audibert, Roy English, and Roger Jordan), and thousands of pages of documents were produced for my review in connection with the preliminary injunction hearing scheduled for October 24.

At the very outset of the hearing, I observed that no evidence had yet been presented as to the "serious health risk" posed by defendants' product, which risk had placed the matter "on a very fast track." *Id.* 3:15–18. I further observed that Magistrate Chesler had been prevailed on at least once and probably two or three times, and that I had almost no sleep for three nights so that I could go through each page of the extensive submissions. *Id.* 3:18. Where, I asked, was evidence of the serious health risk that prompted or required so many people to drop everything and move with this case? *Id.* 3:23–25. Rosen responded that health risk was the first issue on which plaintiffs wished to present evidence, *id.* 4:5–7, and conceded that there was, as yet, no such evidence of record. Subsequently, I again raised the health risk issue, observing that, aside from any claim that defendants' advertising falsely indicated bioequivalence, evidence of adverse health consequences was relevant to the entry of preliminary relief as to plaintiffs' billboarding and passing-off claims. *Id.* 26:2–4.[2] Rosen indicated his agreement with that observation. *Id.* 26:5.

With respect to the health risk issue, Rosen represented that he would present evidence "to demonstrate that in the real world [of] doctors treating there is, indeed, more than a prima facie showing that substitution of theophylline products, including defendant's product, has produced prima facie indications of serious adverse consequences." *Id.* 5:3–8. He thereupon called as witnesses Dr. Leonard Lachman, medical director for Inwood Laboratories (one of defendants' witnesses), *id.* 32–75, and Dr. Mario Gonzalez, director of biopharmaceuticals at Schering Corporation. *Id.* 77–

---

**2.** At the hearing, I suggested a resolution of the first of plaintiffs' claims, which called for cessation of Murray's advertisements falsely indicating bioequivalence between Inwood 100 and 200 mg. theophylline and Theodur. Murray by that time had ceased running the offending advertisements, Hearing 9:8–10, and had sent out adequate corrective notices to pharmacists, *id.* 9:14–20; 10:20–22. The parties agreed to a consent order reciting that an injunction as against Murray was no longer necessary in that recurrence of the offending conduct would constitute a violation of the consent order. *See id.* 10:13; 12:5–6, 12–14. The consent order was to remain in effect notwithstanding the outcome of defendants' jurisdictional and other defenses. *Id.* 10:2–4.

141. Although I defer until later discussion of these doctors' testimony, I note here that on four separate occasions during the testimony, I observed that the presence of a serious health risk had not yet been established. *See id.* 41:14–16; 66:1–4; 91:17–19; 132:21–22. After presenting the testimony of Drs. Lachman and Gonzalez, Rosen indicated that later that week he would call one witness to testify as to the issue of customer confusion between Inwood theophylline and Theodur. Thus, although I had been prepared to rule on the preliminary injunction application then and there, I continued the hearing until October 27, 1988.

By letter dated October 26, 1988, plaintiffs withdrew "all remaining aspects" of their application for a preliminary injunction:

> In light of your Honor's observations, which are incorporated in the Consent Order, 'that in material respects the relief plaintiffs sought by means of an injunction has thus been achieved,' and that 'an injunction therefore no longer is necessary,' we wish to advise the Court that based upon the Consent Order plaintiffs withdraw all remaining aspects of their motion for a preliminary injunction.[3]

The following day, defendants responded by vigorously objecting to the withdrawal, and sought to have me rule on (and reject) the preliminary injunction application. Defendants also set forth their intention to file "promptly" a motion for sanctions against plaintiffs and their New York counsel.

On November 4, 1988, plaintiffs filed a notice of voluntary dismissal pursuant to Fed.R.Civ.P. 41(a)(1)(i), defendants having filed neither an answer nor a motion for summary judgment. The purported reason for this dismissal was my expressed concern as to whether personal jurisdiction existed over Major. I reject this purported reason. In my view, no one who had attended the hearing would not have understood that were I to accede to defendants' request for findings on the preliminary injunction application, which I did not, those findings would have recited the paltry evidence submitted in support of the application and the substantial problems of jurisdiction, venue, and defendants' vicarious liability. More than a mere adverse decision was in the offing and the promised motion for sanctions, therefore, threatened to have real teeth. Stated somewhat differently, the sole reason for the voluntary dismissal was to tie the court's hands.

On December 16, defendants filed the promised motion for sanctions against plaintiffs and their New York counsel, pursuant to Fed.R.Civ.P. 11, 28 U.S.C. § 1927, 15 U.S.C. § 1117, and the inherent power of the federal courts. Defendants seek sanctions on two sets of grounds. First, they assert that plaintiffs and their counsel had no factual or legal basis for claiming that a public health risk was posed by defendants' product, and had no factual or legal basis for claiming that jurisdiction existed over Major, that the action was properly venued here, or that Vitarine and Major were vicariously liable for the actions of Murray, which was not a party to this action. Second, defendants assert that plaintiffs' counsel engaged in abusive litigation tactics, namely, oppressive and improper discovery requests, refusal to provide meaningful reciprocal discovery, obstruction of the depositions of Mssrs. Scheller and Audibert, *ad hominem* attacks and threats, and misrepresentations of law and fact. *See* Defendants' Brief at 16–26. In response, plaintiffs maintain that this Court lacks jurisdiction to entertain the sanctions motion insofar as it was filed forty-two days after plaintiffs filed their notice of voluntary dis-

---

**3.** This Court's statement that injunctive relief was no longer necessary in that plaintiffs had "in material respects" already received the relief they sought was clearly limited to plaintiffs' first claim, i.e., the Murray advertisements of bioequivalence. Indeed, the consent order proposed at the hearing, during the course of which the above-quoted language appeared, only addressed that claim. I expressed no opinion as to the likelihood of success on the merits of plaintiffs' billboarding and "compares to/competes with" claims. Thus, plaintiffs' decision to withdraw the remainder of their preliminary injunction application could not have been based upon any statement by this Court that injunctive relief as to the remaining claims was no longer necessary, for no such statement was made at the October 24 hearing.

missal, thereby terminating the action; and that no sanctionable conduct was perpetrated by plaintiffs' New York counsel.

I will impose sanctions under Rule 11 for the misrepresentations of plaintiffs' counsel regarding the purported serious public health risk posed by defendants' activities.

Fed.R.Civ.P. 11 provides that

[t]he signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Rule 11 is "intended to discourage pleadings that are frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed with bad faith." *Napier v. Thirty or More Unidentified Federal Agents*, 855 F.2d 1080, 1090–91 (3d Cir.1988) (citations omitted). In order to comply with the dictates of the rule, an attorney must conduct "a reasonable investigation of the facts and normally competent level of legal research to support the presentation." *Mary Ann Pensiero v. Lingle*, 847 F.2d 90, 94 (3d Cir.1988) (citations omitted). Reasonableness is to be measured according to the circumstances that existed at the time the pleading or other paper was filed, rather than the circumstances that existed when the Rule 11 motion was filed. *Id.; Gaiardo v. Ethyl Corporation*, 835 F.2d 479, 484 (3d Cir. 1987).

■ The Third Circuit has held that Rule 11 sanctions are to be imposed only in the demonstrated presence of "exceptional circumstances." *Doering v. Union County Board of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir.1988) (citations omitted). Courts have not hesitated, however, to impose sanctions for the filing of a paper upon a finding that the attorney who signed the paper knew or should have known that no factual basis supported the assertions therein. *See Napier*, 855 F.2d at 1091; *McCabe v. General Foods Corporation*, 811 F.2d 1336 (9th Cir.1987); *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff*, 638 F.Supp. 714 (S.D.N.Y. 1986). The fact that a plaintiff chooses to voluntarily dismiss an action may not be used as proof that a Rule 11 violation has occurred; a court must look to what was reasonable in light of the state of affairs at the commencement of the litigation. *Pensiero*, 847 F.2d at 95–96; *see Teamsters Local Union No. 430 v. Cement Express, Inc.*, 841 F.2d 66, 69 (3d Cir.1988) (sanctions inappropriate where "attorney, after time for discovery, is unable to produce adequate evidence to withstand a motion for summary judgment").

In adjudging whether or not a submission or factual representation was reasonable, a court should take into account a number of factors. It should look to

the amount of time available to the signer for conducting the legal and factual investigation; the necessity for reliance on a client for the underlying factual information; the plausibility of the legal position advanced; and whether the case was referred to the signer by another member of the Bar.

*Pensiero*, 847 F.2d at 95, *citing* Fed.R.Civ. P. 11, Advisory Committee note. In addition, a court should also consider the complexity of the legal and factual issues raised by the challenged submission. *Id.*

As an initial matter, I find that plaintiffs' counsel represented to me, in various signed writings, that substitution by pharmacists of Inwood 100 and 200 mg. theophylline for Theodur 100 and 200 mg. theophylline constituted a serious, present health risk to the customers of those pharmacists. As noted *supra*, the complaint alleged that such substitution posed "present hazards to the public, for which there is no adequate remedy of law." Complaint, ¶ 21. Moreover, in plaintiffs' memorandum in support of its order to show cause, submitted to this Court on September 16, 1988, repeated references were made to the significant dangers

presented by defendants' product and activities. *See* Memorandum at 5 ("clear risk to public"), 6 ("public.interest factor is especially significant here due to the risk of harm to the public"), 7 ("grave consequences"), 8 ("paramount public interest factor"), 9 ("hazards defendants' acts create for patients suffering from serious illnesses"). In addition, plaintiffs' proposed order for the preliminary injunction mandated the recall from distribution channels of all of defendants' products which were disseminated under the Murray advertisements indicating bioequivalence, *see* Proposed Order, ¶ C, calling into question Rosen's now-assertion that he did not "suggest [ ] to this court the need for a recall of defendants' products from the marketplace." Rosen Aff., ¶ 12.

The natural import of the above written representations, including the recall sought as to defendants' product, was reinforced by the oral representations made to me in chambers on September 16. Indeed, it is my considered recollection that the abiding contention of plaintiffs' counsel at the September 16 conference was that defendants' product was not bioequivalent to plaintiffs' Theodur, and that this lack of bioequivalence, in and of itself, posed a significant, present, and continuing health risk to consumers. It was because of that representation, delivered with much pathos and urgency and bolstering the numerous references in plaintiffs' papers to a health danger arising from unauthorized substitution, that caused me to set the quick return date plaintiffs indicated public safety required and to send the parties to Magistrate Chesler for expedited discovery if they could not otherwise agree. In the ordinary preliminary injunction application, with no attendant public health risk, a plaintiff would not be entitled (absent significant countervailing factors) to expedited discovery, and the parties were so advised. It was plaintiffs' representation of evidence of a substantial public health risk, and that alone, that prompted me to suggest to the parties, as I suggested to Magistrate Chesler, that expedited discovery could be sought from him.

As previously noted, on September 23, 1988, Magistrate Chesler ordered expedited discovery. Rosen asserts that the Magistrate did so because of the early hearing date, and because defendants refused to provide discovery of their proposed defenses, and not because of any purported health risk. Rosen Aff., ¶¶ 11, 17, 20, 23. He argues, first, that he disputed Purcell's statement, in the latter's letter of October 12, that health risk was central both to the expedited discovery and to the preliminary relief sought by plaintiffs. *See* Rosen Aff., ¶ 11 and Exhs. 8 (letter from William Purcell to Magistrate Chesler, dated October 12) and 9 (letter from Samuel Rosen to Magistrate Chesler, dated October 13). Rosen's letter of October 13, though, only takes issue with Purcell's claim that a public health risk underlay plaintiffs' entitlement to preliminary relief; notwithstanding Rosen's characterization of it, the letter does not address Purcell's claim that the health risk had led to the expedited discovery. *See* Exh. 9, at p. 9.

Rosen next argues that, at the hearing before Magistrate Chesler on September 23, he never said anything concerning "any actual harm emanating specifically from defendants' products." Rosen Aff., ¶ 17. However, it is the Magistrate's recollection that it was represented to him, as I clearly recall it was represented to me, that Inwood theophylline in the 100 and 200 mg. strengths was not bioequivalent to Theodur in those strengths, and that this, *ipso facto*, meant that there was present danger to the public. *See Snow Machines, Inc. v. Hedco, Inc.*, 838 F.2d 718, 728 (3d Cir.1988) (proper, in course of Rule 11 application, for district court judge to inquire of fellow judge as to basis for order entered by latter); *see also* Rosen Aff., ¶ 52 (making reference to "Magistrate's recollection"). Finally, Rosen maintains that because health risk was not a contested issue prior to the conference before the Magistrate on October 11, danger to the public health was not the motivating factor behind the Magistrate's ordering of expedited discovery on September 23. Rosen Aff., ¶ 20. Although the factual predicate for this statement may be true—i.e., that health risk was not contested before the Magistrate until October 11—the opposite conclusion from that

drawn by Rosen is in fact the more likely one: that the Magistrate, based on uncontested allegations of serious health risk in the complaint, other papers, and oral representations, ordered expedited discovery. Certainly, where a serious risk to public health exists, it is critical that necessary jurisdictional discovery be ordered, so that a determination of jurisdiction can be made and lives saved. Accordingly, I find that, notwithstanding Rosen's contentions, Magistrate Chesler was in large part motivated by plaintiffs' representations of significant health risk in ordering expedited discovery on September 23 and, indeed, he has so represented to me.

After all the sound and fury concerning the significant, present health risk from the substitution of defendants' products for plaintiffs' and all the expedited discovery ordered to meet the quick hearing date set because of this sound and fury, plaintiffs' showing, with apologies to Shakespeare, signified virtually nothing. This meager showing, almost lost in the voluminous submissions I reviewed prior to the hearing of October 24th, was, first, the Pernock Affidavit, which relied upon the following language from a medical treatise:

> the rate of [theophylline] absorption varies considerably among different formulations, and changing products after establishing a successful regimen may result in excessive fluctuations in the concentration of theophylline in plasma.

Pernock Aff., ¶ 17. Second, plaintiffs submitted the insert contained in defendants' packaging, which warned of the severe adverse consequences (such as convulsions, arrhythmias, and so on) that could result from overdosage. *See* Plaintiffs' Exh. PX 1. Third, plaintiffs referred to four articles in the medical literature, no one of which referred to defendants' product, and one incident in which an elderly woman switched from defendants' product *to* Theodur and did not improve.

Rosen admitted at the October 24 hearing that this evidence did not suffice to demonstrate "real world ... indications of serious adverse consequences" from substitution. Hearing 5:3–14. Certainly, there was no evidence that even suggested that the "fluctuations" referred to in the treatise were equivalent in meaning to the "overdosage" referred to in defendants' packaging, and no evidence that either condition was likely to result from substitution of defendants' Inwood theophylline for Theodur, even assuming the two products to be non-bioequivalent. In all, prior to the October 24 hearing, plaintiffs did not submit anything approaching sufficient evidence to justify the representations of health risk made to Magistrate Chesler and myself. And, prior to the hearing, defendants produced evidence that, in recent years, 160,000 patients have received 100 mg. and 200 mg. Inwood tablets instead of Theodur with no case of therapeutic failure being reported, and that in California, Theodur has been substituted with the Inwood tablets in the 100 mg. and 200 mg. strengths for years.

At the hearing itself, Rosen stated that he would present evidence that doctors in the real world experienced demonstrated problems with substitution. *Id.* 5:3–8. In an attempt to do so, Rosen first presented Dr. Lachman, one of defendants' witnesses and an employee of Inwood Laboratories. Dr. Lachman testified that he did not perceive a risk from substitution in the 100 and 200 mg. strengths, in that Inwood's 100 and 200 mg. theophylline were bioequivalent to its 300 mg., and its 300 mg. theophylline was bioequivalent to Theodur in the 300 mg. strength. *Id.* 38:2–8.[4] He also knew of no case of documented therapeutic failure attributable to substitution of theophylline products, *id.* 70:11–19, and in fact testified that the total number of adverse reactions following substitution, even though not attributable to the substitution,

---

**4.** Stated somewhat differently, the 100 mg. and 200 mg. strengths of Inwood theophylline, when normalized to the same total dose as the 300 mg. strength, are bioequivalent to the 300 mg. strength of Inwood theophylline which, of course, is bioequivalent to Theodur. Lachman Aff. ¶ 4. While plaintiffs assume that Inwood theophylline and Theodur are not bioequivalent, they presented no credible evidence to support that assumption, resting on the fact that the F.D.A. had not yet found the drugs to *be* bioequivalent.

was "very, very low," probably in the single digits. *Id.* 75:10–19. Finally, Dr. Lachman's explication of the "California study," a study defendants argue was done at plaintiffs' behest but provided to me by defendants and which examined the effects of substituting Inwood theophylline for Theodur, made it clear that the study neither demonstrated any health risk nor eliminated it as a possibility. *See id.* 58–62. Dr. Lachman thus did not provide any evidence in support of plaintiffs' assertion that health risks attended the substitution of Inwood theophylline for Theodur.

Rosen next presented Dr. Mario Gonzalez, employed by Schering Corporation's research group, who too obviously tried to "deliver the goods" for his employer, even to the extent of gratuitously offering observations which included the magic word "confusion" when, of course, he was not called to testify about customer confusion. As relevant to the health issue, Dr. Gonzalez testified that 100 and 200 mg. Theodur reached maximum plasma concentration in eight to nine hours, *id.* 101:6–7, 9–13, whereas the 100 and 200 mg. Inwood theophylline reached maximum concentration in five hours. *Id.* 100:21–23. He then stated that the Baker study had concluded that it was dangerous to substitute one specific product (constant–T, produced by Ciba–Geigy), whose absorption rate was identical to that of Inwood theophylline, for Theodur.[5] *Id.* 102:17–22, 103:16–21, 107:18–23. However, on cross-examination Dr. Gonzalez admitted that even though 300 mg. Inwood theophylline also reaches maximum concentration at five hours, *id.* 118:22–119:4, the

Food and Drug Administration has determined that no health risk is raised by a substitution of 300 mg. Inwood theophylline for that strength of Theodur. *Id.* 120:9–15. He conceded that plaintiffs have not done any studies comparing defendants' product to plaintiffs' product at any dosage nor did he know of any other studies and conceded as well that none of the handful of adverse reaction reports on defendants' products were ever referred to the F.D.A. All of this is most surprising if, indeed, plaintiffs believed defendants' products posed a serious health risk. In any event, Dr. Gonzalez, like Dr. Lachman, failed to provide anything which would cut against a finding that plaintiffs' written and oral representations to me were misrepresentations.

■ Plaintiffs attempt to excuse this utter failure of proof by arguing, for the first time, that they were not expecting to have to produce evidence of health risk at the October 24 hearing, and so were surprised to find that I wanted to hear evidence on that issue. *See* Rosen Aff., ¶¶ 22–23 ("I cannot overemphasize how completely surprised I was by the Court's October 24 statement regarding the health risk issue.")[6] In support of this argument, Rosen first points out that plaintiffs' assertion of health risk was not contested by defendants until October 11. Rosen Aff., ¶ 86; Hearing 5:24–6:5. If it was, indeed, October 11 when defendants first indicated that they intended to contest the validity of the purported health risk,[7] there certainly was no reason for "surprise" when the

---

**5.** There is some dispute between the parties as to the F.D.A.'s evaluation of the reliability of the Baker study. *Compare* Defendants' Reply Brief at 1; Schneiderman Aff., Exh. F *with* Plaintiffs' Surreply Letter at 2; Chelius Declaration, ¶¶ 2–8. Because I find that Dr. Gonzalez's testimony does not establish the presence of a health risk in any event, I need not reach the issue of the study's reliability.

**6.** Plaintiffs' submissions in support of this argument are inherently inconsistent. Rosen's Affidavit, at ¶ 18, quotes me as saying at page 3 of the transcript that plaintiffs had represented that there existed *"actual health danger* to the public arising from the substitution of defendants' ... product for Theodur." (emphasis supplied). *See also* ¶ 23. I said no such thing.

Having erected the strawman, however, plaintiffs' attempt to knock it down: "Prior to the Court's statement at the October 24 hearing, I [Rosen] had not the slightest indication that the Court viewed *actual* (*rather than the general potential for*) health hazard as an issue." (Rosen Aff., ¶ 19) (emphasis supplied). It, thus, appears that plaintiffs and the Court both view the potential for health hazard, rather than documented injury to patients, as the issue which plaintiffs did not prove.

**7.** Again, the parties dispute the date by which plaintiffs were first alerted to the defendants' intention to contest the health risk issue. *Compare* Defendants' Reply at 5–7 *with* Rosen Surreply Aff., ¶ 5(a)–(d).

issue came up at the hearing. Moreover, thirteen days remained between October 11 and the October 24 hearing, during which time plaintiffs could have obtained from the four experts (Drs. Goyan, Garvey, Ellis, and Baker) the evidence they scurried around to now present to me of health risks raised by defendants' product, or could have sought an adjournment of the hearing if they could not obtain such evidence by October 24th. Because nothing from the four doctors was presented to me before or during the October 24 hearing, I will not pause to consider their affidavits now, two-and-one-half months after that hearing.[8]

Rosen next argues that he did not expect to have to present evidence of health risk because the caselaw presumes that adverse health effects, and irreparable harm therefrom, result from misleading representations in pharmaceutical advertisements. *See* Plaintiffs' Brief at 27–28. This argument fails for two reasons. First, in the preliminary injunction context, the issue of irreparable harm *to the movant* is separate from the issue of public interest in enjoining the challenged activity. *See ECRI v. McGraw Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987). Moreover, at the October 24 hearing Rosen recognized, as the caselaw required him to recognize, that the issue of health risk was relevant to the public interest prong of the test for preliminary relief regarding plaintiffs' passing-off claims.[9] Hearing 26:2–5. As the Court of Appeals for the Third Circuit recently noted, albeit in a very different context, "Public health and public safety concerns have traditionally been considered to be of the highest magnitude of public interest considerations." *Transport Workers' Union of Philadelphia, Local 234 v. Southeastern Pennsylvania Transportation Authority,* 863 F.2d 1110, 1124 (3d Cir.1988).

More importantly, I have already found that plaintiffs' counsel represented to me, both in their papers and in their oral representations at the September 16 conference, that there existed a present threat to the public health from substitution of defendants' product, in the 100 and 200 mg. strengths, for plaintiffs' product. That representation was made not in terms of caselaw presumptions of health risk, but in terms of medically demonstrable harm flowing from such substitution. Plaintiffs' counsel accordingly led me to believe that, aside from any judicially presumed risk, they had evidence to support their representations and it was from those representations that the "extraordinar[ily] expedited discovery" flowed.

Plaintiffs may not now assert that, in light of the caselaw presumption, evidence of public health risk was not foreseeably relevant to the October 24 hearing. Any responsible judge, having been told that a public health risk was raised by a defendant's actions, and having been told of that risk in terms beyond that of a judicial presumption of health risk, would be expecting to hear evidence of that risk. Clearly, any judge (myself included) would be more persuaded by evidence of public health risk than by a presumption of such risk (and plaintiffs should at least have been prepared for the possibility that defendants, who indicated that they would contest this claim, might overcome that presumption). Thus, while the judicial presumption might demonstrate that plaintiffs did not have to prove an actual health risk in order to

---

**8.** Rule 11 mandates that a party have in hand the basis for its factual representations prior to the time it makes those representations. Accordingly, plaintiffs should have had in their possession, prior to the filing of the complaint and the preliminary injunction application, the information contained in the four affidavits. Certainly, having been alerted, by October 11, to defendants' intention to contest the health risk issue, plaintiffs had time to do something, rather than nothing.

**9.** The cases cited by plaintiffs refer to a presumption of irreparable harm from unautho-

rized substitution of pharmaceuticals, rather than to a presumption of public interest favoring a preliminary injunction, *see Ciba–Geigy Corp. v. Bolar Pharmaceutical Co., Inc.,* 547 F.Supp. 1095, 1117 (D.N.J.1982); *SK & F Co. v. Premo Pharmaceutical Lab,* 625 F.2d 1055, 1066 (3d Cir.1980); *Morgenstern Chemical Co. v. G.D. Searle & Co.,* 253 F.2d 390, 392–94 (3d Cir.1958). The one case addressing any presumption regarding the public interest, *American Home Products v. Chelsea Laboratories,* 572 F.Supp. 278, 286 (D.N.J.1982), does not mention health risk.

obtain a preliminary injunction, plaintiffs' counsel chose to portray the health risk in terms far beyond the judicial presumption, and thereby made such evidence relevant to the October 24 hearing. There was accordingly no excuse for Rosen's "complete[ ] surprise[ ]" at my interest in such evidence, and the transcript of the hearing clearly belies even a hint of surprise.[10] And to suggest, as Rosen suggests, that I "opened" the issue, an issue that only in "the Court's view . . . was not only an open one but decisive to plaintiffs' motion . . ." is extremely troubling, particularly given all that went before. Part of what "went before" were plaintiffs' Proposed Findings of Fact and Conclusions of Law, dated October 21, 1988—a mere three days before the hearing—and signed by Rosen, in which, at Conclusion # 17, Rosen indicates that "the critical issue" before me was "public health and safety."

■ In sum, it is clear beyond peradventure that plaintiffs' counsel represented to me, in their papers and at the September 16 conference, and represented to Magistrate Chesler at the September 23 conference, that substitution of Inwood 100 and 200 mg. theophylline for those dosages of Theodur posed a significant present risk of danger to the public health. That representation which, of course, was a misrepresentation because it was false or misleading, caused this matter to be put on a "very fast track," and subjected the court and the defendants to the burden of preparing for and participating in a preliminary injunction hearing on an expedited basis at great expense to defendants. Plaintiffs did not, at any relevant time, present evidence to support that assertion. And when they

were through bringing everyone to their knees, they simply withdrew what remained of their preliminary injunction application and voluntarily dismissed the complaint for reasons no more credible than the representations which have brought us to this point.

It bears mention that there was nothing inadvertent or accidental about what was represented to me and what transpired as a result. Plaintiffs' counsel were intimately familiar with their clients' operation and product, having represented those clients over a period of years. So, too, counsel had litigated many similar claims on behalf of plaintiffs and other clients (see e.g., Lee Aff. ¶¶ 15, 16) and portrayed themselves as having special knowledge in the law of unfair competition (id. at ¶ 14), considerable experience with injunctions of the type sought here (id. at ¶ 16), and familiarity with the medical literature in the field (id. at ¶ 18; Rosen Aff. ¶ 8).

The relevant *Pensiero* factors all support the imposition of Rule 11 sanctions: Expertise and prior experience aside, plaintiffs had some five months between the date they discovered the Murray advertisements and the date on which they filed suit, and another month until the October 24 hearing to conduct the necessary legal and factual investigation and to determine whether their position was plausible; plaintiffs' counsel did not have to rely upon their clients for the underlying factual information; and the factual issues, while perhaps complex, were well within the competence of plaintiffs' counsel, who admit to having prosecuted over twenty applications for preliminary relief against manufacturers and/or distributors of generic drugs.[11]

---

**10.** Rosen admits that he was unprepared to offer evidence on health risk and presented what little he did only to "avoid embarrassment by giving the impression that [he] was prepared" and to "accommodate the court." Rosen Aff., ¶ 22. Separate and apart from the quality, or lack thereof, of the proofs he elicited, Rosen at no time indicated that he was neither expecting nor ready to go forward on this issue. And his suggestion that he was in any sense cowed by the Court is incredible given the bullying tactics in which he engaged during discovery both in this case and in another case in which he was sanctioned for that conduct. *Unique Concepts, Inc. v. Brown,* 115 F.R.D. 292 (S.D.N.Y.1987).

**11.** Generic drugs are typically 50% to 80% less expensive than their brand-name counterparts (Jordon Aff. ¶ 2) and, thus, there is a strong public interest, particularly among senior citizens, favoring the substitution of safe and effective generic drugs for brand name drugs. It appears that sales of defendants' products have been making significant inroads into plaintiffs' sales and, while I do not find that this case was brought to harass an increasingly successful competitor, I have the abiding sense that that is so.

Rule 11 sanctions are eminently appropriate, and will be imposed assuming I have jurisdiction to do so, and I do.

The majority of circuits addressing the issue have held that Rule 11 sanctions may be imposed upon motion of a defendant filed subsequent to a plaintiff's voluntary dismissal under Rule 41(a)(1)(i). *Muthig v. Brant Point Nantucket, Inc.*, 838 F.2d 600, 603–04 (1st Cir.1988); *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1077–79 (7th Cir.1987); *Greenberg v. Sala*, 822 F.2d 882, 885 (9th Cir.1987); *see also Kurkowski v. Volcker*, 819 F.2d 201, 203 (8th Cir.1987).[12] Only the Court of Appeals for the Second Circuit has reached the contrary conclusion. *See Johnson Chemical Co., Inc. v. Home Care Products, Inc.*, 823 F.2d 28 (2d Cir.1987). The Second Circuit has recognized, however, that its conclusion represents a minority view. *See Barr Laboratories, Inc. v. Abbott Laboratories*, 867 F.2d 743, 747 (2d Cir.1989) (attached at Defendants' Reply Brief, App. A).[13]

12. Plaintiffs cite an earlier decision by the Court of Appeals for the Eighth Circuit, *Foss v. Fed'l Intermediate Credit Bank of St. Paul*, 808 F.2d 657 (8th Cir.1986), in which the court reversed the imposition of Rule 11 sanctions by the district court following the filing of a notice of voluntary dismissal, for the proposition that *Kurkowski* only held that the district court had jurisdiction to consider a Rule 11 motion filed *prior* to the filing of a notice of voluntary dismissal. *See* Plaintiffs' Brief at 11. I read *Foss* to hold both that a court may not condition a Rule 41 dismissal upon payment of counsel fees or of costs, and that a court may not, subsequent to the filing of a Rule 41 notice, reach the merits of the lawsuit. *See Foss*, 808 F.2d at 660 ("The district court was, therefore, without jurisdiction to pass upon the merits of the case"). In *Foss*, the Rule 11 sanction was imposed on the basis of the district court's explicit finding that the Foss' complaint was "not well grounded in fact or warranted by law and totally frivolous" —clearly a merits determination, which was precluded by plaintiffs' voluntary dismissal of the action. Because my decision here does not (and, at this stage, could not) condition plaintiffs' voluntary dismissal, and because my decision does not represent in any way a determination of the merits of plaintiffs' complaint, *Foss* does not preclude my consideration of defendants' Rule 11 application.

Moreover, I do not agree with plaintiffs' contention that the Eighth Circuit "acknowledged in *Kurkowski* that *Foss* would control where the voluntary dismissal notice was filed before the defendant filed a motion for sanctions." *See* Plaintiffs' Brief at 11, *citing Kurkowski*, 819 F.2d at 203 n. 7. That footnote distinguishes *Foss* on the ground that, whereas *Foss* involved sanctions imposed *sua sponte* by the district court after the filing of a notice of voluntary dismissal, *Kurkowski* involved a motion to dismiss and for sanctions filed prior to the voluntary dismissal. I do not read that footnote as holding that the timing of the sanctions motion is dispositive of the jurisdictional issue; the footnote serves only to factually distinguish *Foss* from *Kurkowski*. Because *Foss* may be explained in terms other than the timing of the sanctions motion, I cannot accept plaintiffs' limiting interpretation of footnote seven in *Kurkowski*.

13. Plaintiffs cite numerous cases to demonstrate that the holdings of *Muthig, Szabo, Greenberg*, and *Kurkowski* are a minority view. *See* Plaintiffs' Brief at 10–11. The great majority of the cited cases do not involve the court's authority to entertain fee petitions or sanctions motions subsequent to a Rule 41 dismissal; rather, they stand only for the unremarkable proposition that a Rule 41(a)(1)(i) dismissal prevents the court from conditioning that dismissal (such as by dismissing with prejudice) and prevents the court from reaching the merits of the action. *See Universidad Central Del Caribe v. Liason Comm. on Education*, 760 F.2d 14, 19 (1st Cir. 1985); *Winterland Concessions Co. v. Smith*, 706 F.2d 793, 795–96 (7th Cir.1983); *Carter v. United States*, 547 F.2d 258 (5th Cir.1977); *D.C. Electronics, Inc. v. Nartron Corp.*, 511 F.2d 294, 296–98 (6th Cir.1975); *Miller v. Reddin Corp.*, 422 F.2d 1264, 1266 (9th Cir.1970). Similarly, in *Manze v. State Farm Insurance Co.*, 817 F.2d 1062, 1065–66 (3d Cir.1987), the Third Circuit held only that a Rule 41(a)(1)(i) dismissal precludes a subsequent determination of the merits of the action (as by dismissal with prejudice), or a subsequent conditioning of dismissal upon payment of costs. None of these cases stand for the proposition that a district court may not, subsequent to a voluntary dismissal, decide a Rule 11 motion (such as the one before me) which is collateral to the main action and which does not entail a determination of the action's merits.

The one cited case that addresses a fee petition filed after a voluntary dismissal, *Williams v. Ezell*, 531 F.2d 1261 (5th Cir.1976), may be distinguished on the same grounds upon which I distinguished *Foss*. The district court in *Williams* did not give effect to plaintiff's notice of voluntary dismissal and, instead, both dismissed the matter with prejudice and imposed sanctions against plaintiff for having brought a frivolous action. The Fifth Circuit held, as had the Eighth Circuit in *Foss*, that the Rule 41 dismissal prevented the district court from either reaching the merits of the case or conditioning plaintiff's right to dismiss without prejudice. *Id.* at 1264. Again, because I seek to do neither of these prohibited acts, *Williams* is inapposite.

■ I am persuaded by the reasoning of the First, Seventh, and Ninth Circuits that Rule 11 sanctions may properly be imposed after an action has been voluntarily dismissed under Rule 41(a)(1)(i). Rule 11 sanctions have been likened to a contempt of the court, and it is not seriously controverted that a party may not escape punishment for contempt by filing a notice of voluntary dismissal. *See Muthig*, 838 F.2d at 603–04; *Szabo*, 823 F.2d at 1078–79. Similarly, the Rule 11 violation is complete upon the misrepresentation of law or fact, and that misrepresentation may not be erased by a subsequent dismissal of the action in the course of which the misrepresentation was made. *See Greenberg*, 822 F.2d at 885. Moreover, so long as the fact of voluntary dismissal is not considered to be evidence of a Rule 11 violation, the imposition of sanctions will not interfere with the purposes of Rule 11 given that the voluntary dismissal will still preclude any determination of the merits of the underlying action, and will still permit the refiling of the action.[14] *Accord Muthig*, 838 F.2d at 604.

■ Retention of jurisdiction for the purpose of imposing Rule 11 sanctions following a plaintiff's voluntary dismissal of an action is especially appropriate under the circumstances of this case. I do not rely upon the fact of voluntary dismissal as evidence of a violation of Rule 11, nor do I rule on the underlying merits of either the complaint or the asserted defenses thereto. Rather, the imposition of sanctions here is bottomed entirely upon plaintiffs' false or misleading representations that evidence of a serious health risk would be forthcoming. *See also* Defendants' Reply Brief at 20 n. 4

(Rule 11 sanctions sought as to facts and circumstances preceding voluntary dismissal, not as to fact of voluntary dismissal itself). Moreover, by filing their complaint and seeking extensive expedited discovery and an expedited hearing date on their application for preliminary injunctive relief, plaintiffs made it more likely that they would receive a hearing on the application prior to the filing of an answer or a summary judgment motion, thus preserving their right to a voluntary dismissal upon notice. Given these circumstances, which rendered it virtually impossible for defendants to have filed their Rule 11 motion prior to the dismissal of the action, retention of jurisdiction to consider that motion is appropriate. Were it otherwise, a Rule 41 dismissal could be used with impugnity as a shield against any Rule 11 sanction imposed for violations committed, as here, during the course of abbreviated, albeit intense, litigation.

Moreover, although the Third Circuit has not directly addressed this issue, two decisions of that court support the conclusion that this court has jurisdiction over defendants' application. First, the Third Circuit has held that a district court had jurisdiction to entertain a Rule 11 motion filed after the Third Circuit had issued its mandate affirming the district court's grant of summary judgment against plaintiff. *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90 (3d Cir.1988). In *Pensiero*, the sanctions motion was filed by defendants two days prior to the issuance of the mandate (the issuance of which renders final the appellate court's decision), but the Third Circuit specifically observed that jurisdiction over the sanctions motion would exist even had the mandate issued before the motion was filed.[15]

**14.** Plaintiffs appear to argue that the imposition of Rule 11 sanctions under the circumstances of this case would deter plaintiffs from utilizing Rule 41's voluntary dismissal procedure in that the voluntary dismissal would itself be used as proof of a Rule 11 violation. *See* Plaintiffs' Brief at 11–12. First, I expressly do not rely upon plaintiffs' voluntary dismissal in my holding that sanctions are appropriate here, and thus plaintiffs are not being penalized in any way for having voluntarily dismissed the action. Second, because the Rule 11 violation is complete upon the misrepresentation of law or fact, the knowledge that a sanction might be imposed would in fact encourage the early filing of vol-

untary dismissal notice, so that attorney's fees, for one thing, would no longer accrue. Otherwise, a party, having committed a Rule 11 violation, would wait until the last possible moment before tendering its notice of voluntary dismissal under Rule 41.

**15.** Plaintiffs describe *Pensiero* as "[h]olding that the case was *sub judice* prior to the issuance of the mandate," and that therefore the sanctions motion was timely. Plaintiffs' Brief at 6. The Third Circuit stated in *Pensiero* that, although the Rule 11 motion was indeed filed two days prior to the issuance of the mandate, it "d[id] not rest [its] decision here on that limited

In so holding, the *Pensiero* court relied upon the decision of the Supreme Court of the United States in *White v. New Hampshire Dep't of Employment Security*, 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982), in which attorney's fees under 42 U.S.C. § 1988 were awarded upon a motion filed four months after entry of an unappealed final judgment. The Supreme Court held that the attorney's fee application was collateral to and "uniquely separable" from the main cause of action in that determination of the fee petition did not involve inquiry into the merits of the litigation. *Id.* at 451–52, 102 S.Ct. at 1166–67. The Third Circuit indicated no difficulty in holding that the reasoning of the *White* court, in the context of a § 1988 fee petition, applied to the Rule 11 sanctions sought in *Pensiero.* 847 F.2d at 98; *see Hicks v. Southern Maryland Health Systems Agency*, 805 F.2d 1165, 1166 (4th Cir.1986) (in holding that district court had jurisdiction to impose sanctions after appellate affirmance of a grant of summary judgment, court applied *White* to Rule 11 application).[16] Plaintiffs have given me no reason why the *Pensiero* holding as to jurisdiction should not be applied in the context of a sanctions

motion filed after a voluntary dismissal, rather than after an affirmance of summary judgment,[17] and no such reason is apparent from the face of the *Pensiero* decision.

The second opinion of the Third Circuit which supports a finding of jurisdiction over defendants' application is *Eash v. Riggins Trucking Inc.*, 757 F.2d 557 (3d Cir.1985) (*en banc*), in which the court held that the district court had jurisdiction to consider a sanctions motion under, *inter alia*, 28 U.S.C. § 1927, even though the motion was filed eleven days after the entry of a stipulation of dismissal. 757 F.2d at 559–560. Plaintiffs concede that they can perceive no jurisdictional difference between applications for sanctions under Rule 11 and under § 1927. *See* Plaintiffs' Brief in Opposition to Motion for Sanctions at 16. Moreover, caselaw supports the view that Rule 11 motions and § 1927 motions are to be considered identical *vis-a-vis* the district court's jurisdiction to entertain them. *See Hicks*, 805 F.2d at 1166; *Gordon v. Heimann*, 715 F.2d 531, 537 (11th Cir.1983). Accordingly, the holding in *Eash* that the district court was not divested of jurisdiction to consider a § 1927 sanctions motion by the dismissal of the underlying action applies with equal force to the Rule 11 motion before me.[18]

---

ground." 847 F.2d at 98. Accordingly, the *Pensiero* court held that the Rule 11 petition would be timely even if filed after the mandate's issuance. *Id.*

**16.** The Third Circuit, therefore, would reject plaintiffs' argument that 42 U.S.C. § 1988, as the embodiment of "the highest national policy" regarding civil rights, is inapplicable to Rule 11 petitions. Plaintiffs' Brief at 9 n.*.

**17.** In fact, plaintiffs seek to apply *Pensiero* to this matter with respect to that case's prospective rule regarding the proper timing of Rule 11 motions. *See* Plaintiffs' Brief at 16–17. Plaintiffs may not fairly seek to apply *Pensiero* in this manner and yet not apply it with respect to that case's jurisdictional holding.

**18.** Plaintiffs attack the timeliness of the Rule 11 motion on three additional grounds. First, they contend that *Pensiero* requires that all Rule 11 motions be filed either "before the entry of a final judgment," or "at an earlier time—as soon as practicable after discovery of the Rule 11 violation." Plaintiffs' Brief at 6, *quoting Pensiero*, 847 F.2d at 100. I reject that contention, on the facts of this case, for a number of reasons. The animating concern of the *Pensiero* court was to avoid the piecemeal appeals which would result if the merits decision was appealed

separately from the sanctions decision. *See* 847 F.2d at 99–100 ("In that way, the district court will be able to decide the matter in a timely fashion so as to eliminate additional appeals.") This consideration clearly carries no weight in this matter, where only one appeal—that from a decision on this sanctions decision—is possible. Moreover, I find that, given the extraordinary pace of this litigation, defendants filed this motion as soon as practicable after discovery of the Rule 11 violation—November 4, 1988, the date on which it first became apparent that plaintiffs were not intending to furnish any evidence with respect to the health risk issue. In addition, plaintiffs have pointed to no prejudice arising from the delay between their notice of voluntary dismissal and defendants' Rule 11 motion. Thus, I find that *Pensiero* does not preclude any consideration of defendants' motion.

Plaintiffs also contend that Rules 23 and 46 of the Rules of this court require that fee petitions be filed within thirty days of the entry of judgment, whereas this motion was filed forty-two days after the Rule 41 dismissal. *See* Plaintiffs' Brief at 17. First, I note that Local Rule 23 applies only to petitions for costs, not attorney's fees, despite plaintiffs' contention to the contrary. The reference to § 1927, Local Rule 23(C), is clearly limited to awards of costs, not

I will impose a monetary sanction in the amount of $100,000 against plaintiffs, Alfred T. Lee, Esq., Samuel D. Rosen, Esq., and the firm of Milgrim, Thomajan & Lee, P.C.,[19] with the amounts attributable to each to be determined among themselves and paid over to counsel for defendants within thirty days. I choose to limit the Rule 11 violation on which I impose this sanction to misrepresentations of serious health risk which led to massive discovery on an expedited basis and unnecessarily expedited proceedings before Magistrate Chesler and myself. Implicit in so limiting the violation is my assumption that, absent allegations of serious health risk, plaintiffs could nonetheless have sought a preliminary injunction which might not have been found wholly frivolous. Discovery would then have proceeded in the normal course and the hearing would have been held well down the road, most likely after defendants' substantial motion to dismiss had been decided if anything remained of plaintiffs' case.

I called upon defendants to attempt to allocate that portion of their fees and disbursements attributable to the expedited nature of these proceedings. Their "best estimate," in response to that request, was fees in the range of $192,000—$217,000 and disbursements in the range of $27,000–

$32,000. Purcell Aff. ¶ 4. It is clear, I believe to all, that it is virtually impossible under the circumstances of this case to efficiently and accurately allocate fees and disbursements. It is also clear, however, that if a precise figure could be ascertained, it would be a healthy chunk of the $379,457.50 in total fees and $54,112.22 in total disbursements defendants expended in this intensely litigated and then aborted matter, figures to which, of course, must be added the fees and disbursements attributable to litigating the motion for sanctions.[20] Thus, I have somewhat arbitrarily determined that $100,000 is a reasonable and appropriate sanction, in full confidence that were an accurate allocation possible, the figure would be considerably higher.

I reject plaintiffs' last ditch argument made by plaintiffs' New Jersey counsel against whom sanctions were not sought, that because the vast bulk of the expedited discovery taken here did not bear on the health risk issue but, rather, on the "non-merit defenses," the expenses for virtually all of the discovery are irrelevant for purposes of sanctions. Certainly, if the court had been permitted to decide whether or not defendants' "non-merit defenses" had merit, and had found in defendants' favor, there could have been no relief even if there had been evidence of a serious health

attorney's fees, and the reference to counsel fees, Local Rule 23(G)(5), states only that if counsel fees are otherwise awarded, the statutory attorneys' docket fee is not also awarded. Second, with respect to Local Rule 46, I note that the rule permits extension of the time for filing by order of the court, and neither states nor implies that the extension must be granted within the thirty day period. In any event, local rules are not jurisdictional in nature, *see Hicks,* 805 F.2d at 1167, and noncompliance may be excused by the court in its discretion, according to the equities of the matter. *See Slanina v. William Penn Parking Corp., Inc.,* 106 F.R.D. 419, 422 (W.D.Pa.1984); *Hall v. C.I.R. (Dep't of Treasury),* 805 F.2d 1511, 1514 (11th Cir.1986); *Gerritsen v. Escobar y Cordova,* 688 F.Supp. 556, 558 (C.D.Cal.1988); *see also American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970) ("It is always within the discretion of a court ... to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it."); Local Rule 1(A) ("Unless otherwise stated, any rule may be relaxed or dispensed

with by the Court if adherence would result in surprise or injustice.") Accordingly, to the extent that Local Rule 46 would prevent defendants' Rule 11 motion from being heard, I hereby permit the filing of that motion twelve days out of time, in the interests of justice.

**19.** Messrs. Lee and Rosen signed one or more of the relevant papers in this matter. Even had he signed none, Rosen, as an individual clearly responsible both for the contents of the bulk of those papers and for the oral representations made to this Court, may be sanctioned pursuant to Rule 11. *See Itel Containers Int'l v. Puerto Rico Marine Mgt.,* 108 F.R.D. 96, 103 (D.N.J. 1985).

**20.** Time and disbursement records indicate that "the reasonable expenses incurred in defending the preliminary injunction application are $316,958.75 in attorneys' fees and $47,299.80 in disbursements" and, as of February 26, 1989, "the reasonable expenses incurred ... in connection with the sanctions application are $62,-498.75 in attorneys' fees and $6,812.42 in disbursements." Purcell Aff. ¶¶ 2, 3.

risk. I also reject plaintiffs' argument that, health risk aside, once the application for a preliminary injunction was noticed, the massive discovery taken *could* have been taken within the same period of time without an order expediting discovery. The history of this case wholly belies any such argument for there was intervention by the court and an order expediting discovery for one reason and one reason only—the parties could not agree on a discovery schedule. Thus, health risk aside, the discovery would not because it could not have been taken within the same time frame absent an order of the court. And, I note, that had there not been misrepresentations that there would be evidence of a serious health risk, there would have been no need to have even tried to take this discovery within the same time frame, if for no other reason than that this case simply would not have been heard on October 24, 1988.

An appropriate order will issue.