SCHERING CORPORATION and Key Pharmaceuticals, Inc.

v.

VITARINE PHARMACEUTICALS, INC. and Major Pharmaceuticals Corp.

Appeal of MILGRIM THOMAJAN & LEE P.C., Alfred T. Lee and Samuel D. Rosen, in No. 89–5309.

SCHERING CORPORATION and Key Pharmaceuticals, Inc., Appellants in No. 89–5310.

v.

VITARINE PHARMACEUTICALS, INC. and Major Pharmaceuticals Corp.

Nos. 89–5309, 89–5310.

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1989.

Decided Nov. 14, 1989.

district court's present worth calculation), the

ADEA extended the age ceiling *beyond* age 70.

William O. Purcell (argued) and John Sullivan, Lord Day & Lord, Barrett Smith, New York City, and Robert Novack, Budd Larner Gross Picillo Rosenbaum Greenberg & Sade, Short Hills, N.J., for appellees.

Before BECKER, COWEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

Schering Corporation ("Schering"), Key Pharmaceuticals, Inc. ("Key"), and their counsel, Alfred T. Lee, Samuel D. Rosen and the law firm Milgrim Thomajan & Lee P.C., appeal from an order of the United States District Court for the District of New Jersey entered March 13, 1989 imposing $50,000 in sanctions jointly against Schering, Key and their counsel pursuant to Fed.R.Civ.P. 11 and from an amended order dated and entered March 22, 1989, increasing the amount of the sanctions to $100,000.[1] Because the record does not support the imposition of Rule 11 sanctions, we will reverse.

### I.

Schering and Key commenced this action on September 16, 1988. Numerous claims set forth in the complaint and amended complaint allege violations of 15 U.S.C. §§ 1114 & 1125(a), and related provisions of state law arising from Vitarine and Major's advertising, promoting and labeling of their prescription theophylline drugs offered in competition with those of Schering and Key. Plaintiff Key Pharmaceuticals, Inc. is a wholly-owned subsidiary of Schering Corporation. Key is incorporated in Florida and has its principal place of business in New Jersey.

Defendant Vitarine Pharmaceuticals, Inc. ("Vitarine") is a pharmaceutical manufacturer and distributor. It is a New Jersey corporation with its principal place of business in New York. It owns four drug wholesalers, including non-party Murray Drug Corporation ("Murray"), which joint-

Robert A. Meister (argued) and William M. Hart, Milgrim Thomajan & Lee P.C., New York City, for Milgrim Thomajan & Lee P.C., et. al., appellants.

Matthew P. Boylan (argued), Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for Schering Corp., et. al., appellants.

1. While sanctions were imposed solely pursuant to Fed.R.Civ.P. 11, sanctions and attorneys' fees were sought under 28 U.S.C. § 1927, 15 U.S.C. § 1117 and Rule 11.

ly own defendant Major Pharmaceuticals Corporation, the owner and licensor of the name and trademark "Major" used by all four of those companies. Under their name and mark, "Major," the defendants sell the sustained-release ("SR") theophylline tablets of Forest/Inwood Laboratories, which the latter sells to others under the mark "Theochron." Schering and Key allege that defendant Vitarine owns, controls and is otherwise responsible for the acts of defendant Major.

Theophylline has been used for many years in treating chronic asthma. Theophylline's effect is directly related to its concentration in a patient's bloodstream. Concentrations of less than 10 micrograms of theophylline per milliliter of blood may result in little or no benefit to the patient, whereas concentrations above 20 micrograms per milliliter result in a markedly higher incidence of side effects.[2] An insert included in each package of Theochron explains that the side effects may range from nausea and restlessness to cardiac arrhythmias, convulsions and death.[3]

The rate and extent to which the therapeutic ingredient of a drug is absorbed is known as its "bioavailability." 21 U.S.C. § 355(j)(7)(A) (Supp. V 1987). The Food and Drug Administration ("FDA") considers two drugs "bioequivalent," i.e. therapeutically equivalent, if their bioavailability under similar experimental conditions does not differ significantly. *See* Center for Drug Evaluation and Research, U.S. Food and Drug Administration, Approved Drug Products with Therapeutic Equivalence Evaluations at 1–2 (8th ed. 1988); 21 U.S.C. § 355(j)(7)(B) (Supp. V 1987).

In its publication, Approved Drug Products with Therapeutic Equivalence Evaluations, also known as the "Orange Book," the FDA lists all approved drugs currently on the market along with ratings indicating their therapeutic equivalence. An "AB" rating signifies that the manufacturer has provided adequate studies to establish the bioavailability and the bioequivalence of its product. Center for Drug Evaluation and Research, U.S. Food and Drug Administration, Approved Drug Products with Therapeutic Equivalence Evaluations at 1–5 (8th ed. 1988). A "BC" rating signifies a controlled-release drug for which the manufacturer has not submitted appropriate studies specifically demonstrating the bioequivalence of that particular formulation. *Id.* at 1–6. At the time the complaint was filed, Schering's Theo–Dur was listed with an AB rating in 100 and 200 mg. tablet forms; Theochron was listed with a BC rating in those forms, indicating Forest/Inwood had not submitted studies demonstrating that Theochron was bioequivalent to Theo–Dur in those doses.

On September 16, 1988, counsel for plaintiffs, Schering and Key, and counsel for defendants, Vitarine and Major, appeared in the chambers of the district judge on plaintiffs' application for an order to show cause for a preliminary injunction. Schering and Key sought injunctive relief as to two claims. First, they claimed that defendants falsely advertised that Murray Drug Corporation's 100 and 200 mg. Theochron theophylline was bioequivalent to Schering's Theo–Dur theophylline. Second, they claimed that Murray's advertisement of its competing generic product was misleading. In this regard, Schering and Key alleged

**2.** Klein, *Problems with Generic Theophylline and Indiscriminate Brand Switching*, 58 Annals of Allergy 350 n. 1 (1987); Baker, Moessner, Gonzalez, Grabenstein, Renard, DeNapoli, Summers & Schuster, *Clinical Relevance of the Substitution of Different Brands of Sustained–Release Theophylline*, 81 J. Allergy & Clinical Immunology 664, 671 n. 2 (1988).

These articles are exhibits to Plaintiff's Supplemental Memorandum in Support of an Order to Show Cause for a Preliminary Injunction, *Schering Corp. v. Vitarine Pharmaceuticals, Inc.*, 124 F.R.D. 580 (D.N.J.1989).

**3.** The package insert states:

Less serious signs of theophylline toxicity, i.e., nausea and restlessness, may appear in up to 50% of patients. Unfortunately, however, serious side effects such as ventricular arrhythmias, convulsions, or even death may appear as the first sign of toxicity without any previous warning. Stated differently, *serious toxicity is not reliably preceded by less severe side effects.*

Exhibit 1 to Plaintiff's Supplemental Memorandum of Law in Support of an Order to Show Cause for a Preliminary Injunction, *Schering v. Vitarine* (Civ. No. 88–4046).

that the defendants' advertising featured the Theo–Dur trademark as the most prominent visual element, thereby implying that defendants' product was the same as, or related to, Theo–Dur. Complaint at ¶ 16(a). As to both claims, plaintiffs sought a prompt hearing and expedited discovery.

The complaint carried a sense of urgency. Paragraph 21 states, "Defendants' aforesaid acts have caused and, unless enjoined by this court, will continue to cause great and irreparable injury to plaintiffs and present hazards to the public, for which there is no adequate remedy at law." Plaintiffs' Memorandum in Support of an Order to Show Cause for a Preliminary Injunction dated September 16, 1988 states that "[b]ecause of the grave consequences that may follow from mistaken medication involving prescription drugs which are sold in a deceptive manner, relief in such cases is granted upon lesser proof than required where other product categories are involved in infringement litigation." Memorandum at 7–8. The memorandum further states that "[a]side from the hazard defendants' acts create for patients suffering from serious illnesses, defendants' representations of bioequivalence expose plaintiffs to adverse reactions of physicians, pharmacists and patients who mistakenly attribute to Theo–Dur the inadequacies of defendants' 100 and 200 mg tablets which the latters' advertising presents as the equivalent of Theo–Dur 100 and 200 mg tablets." Memorandum at 9.

In addition to the representations made in the complaint and memorandum in support of an order to show cause, counsel for Schering and Key allegedly made certain representations in the course of presenting the complaint to the district judge in chambers on September 16, 1988. This in-chambers proceeding was not transcribed and the parties now differ as to what was actually said during the proceedings.[4]

The district court wrote:

Whatever the precise assertions, ... it was made absolutely clear to me that if I did not act, and act immediately, trouble—real trouble—loomed ahead for any patient subjected to a substitution of defendants' product for Theodur in the 100 mg. and 200 mg. dosages. [Counsel for Schering and Key] thus invested his application with an importance and an urgency which would prove to be wholly unwarranted by the facts.

*Schering Corp. v. Vitarine Pharmaceuticals, Inc.*, 124 F.R.D. 580, 582 (D.N.J.1989). October 24, 1988 was set as the hearing date on the preliminary injunction application. The parties were to petition the assigned magistrate in the event expedited discovery could not be agreed upon.

On September 19, 1988, John Sullivan, counsel for Vitarine and Major, telephoned Samuel D. Rosen, counsel for Schering and Key, and told him that defendants agreed that the FDA had not yet determined Theochron to be bioequivalent to Schering's Theo–Dur in the 100 and 200 mg. tablet strengths. Mr. Sullivan stated that Murray Drug Corporation had made an honest mistake in issuing the advertisement and that Murray was no longer running it. Affidavit of John Sullivan at ¶ 4, *Schering v. Vitarine* (Civ. No. 88–4046).

On September 23, the parties appeared before the magistrate on plaintiffs' application for expedited discovery, which was

---

**4.** According to John Sullivan, counsel for defendants, "Plaintiffs took the position [during the conference] that expedited discovery was necessary, emphasizing that this case supposedly raised a serious public health issue and that discovery would be necessary on the issue of bioequivalence." Affidavit of John Sullivan at ¶ 3, *Schering v. Vitarine* (Civ. No. 88–4046) (filed Oct. 19, 1988).

However, according to an affidavit submitted by Samuel Rosen, counsel for plaintiffs, Rosen did not make such representations. He states:

The Court asked me whether defendants' product created a health hazard to the public. I responded by pointing the Court to the last paragraph of the Pernock Affidavit, which quotes from the Goodman and Gilman treatise on the health risks presented by substituting one brand of theophylline for another. I did not make any assertion that the substitution of defendants' 100mg or 200mg tablets for THEO–DUR in those strengths would create an imminent health danger or any risk more severe or pronounced than the general risk described in the literature.

Affidavit of Samuel D. Rosen at ¶ 8, *Schering v. Vitarine* (Civ. No. 88–4046).

granted. The magistrate suggested that Murray Drug Corporation send a notice to its customers, informing them of the mistaken advertising. On September 24, Murray sent out a corrective notice to its customers.

On October 24, 1988, at the outset of the preliminary injunction hearing, the district court suggested that plaintiffs, defendants and the related non-party Murray Drug Corporation consent to an order by which Murray and defendants would not advertise their products as bioequivalent to Theo–Dur. The parties agreed in principle. The preliminary injunction hearing of October 24 continued respecting other alleged misuses of Schering's Theo–Dur mark and was adjourned until October 27. Prior to October 27, however, Schering withdrew the unresolved issues on the preliminary injunction motion.

On November 3, the district court signed an order embodying the agreement not to advertise suggested on October 24. On November 4, no answer or motion for summary judgment having been filed by the defendants, Schering and Key filed a notice of dismissal pursuant to Fed.R.Civ.P. 41(a)(1)(i).

On December 16, 1988, defendants moved for an order imposing sanctions pursuant to Rule 11 and the court's inherent power and awarding attorneys' fees pursuant to 28 U.S.C. § 1927 and 15 U.S.C. § 1117(a). On February 16, 1989, at oral argument on the motion, the court instructed defendants' counsel to submit evidence showing the amount of incremental costs incurred by them as a consequence of the "fast track" upon which the case was put due to Schering and Key's representations of serious health risks.

On March 10, 1989, the district court found Rule 11 had been violated and assessed sanctions of $50,000. The district court reasoned that sanctions would be imposed for plaintiffs' misrepresentation of the health risk associated with substitution of Theochron for Schering's Theo–Dur in

100 and 200 mg. doses. According to the district court, plaintiffs had not at any time presented evidence to support their assertion of a serious health risk. *Schering v. Vitarine*, 124 F.R.D. at 590. The false statements had caused the litigation to be put on a "very fast track" and had subjected the court and defendants to the burden of preparing for the preliminary injunction hearing on an expedited basis, at great expense to the defendants. *Id.*

Thereafter, counsel for the defendants, by way of a letter to the court, suggested that the court misunderstood the defendant's originally submitted cost figures. Counsel's letter further explained the defendants' cost calculations and requested, if the court deemed it appropriate, that the opinion be amended to accurately reflect their litigation costs. On March 22, 1989, the court amended the March 10 order (without affording appellants an opportunity to be heard) increasing the amount to $100,000.[5]

This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1982).

## II.

A preliminary question presented on this appeal is whether the district court had jurisdiction to impose Rule 11 sanctions after the plaintiffs had voluntarily dismissed the action pursuant to Fed.R.Civ.P. 41(a)(1)(i). It is a question of first impression in this Circuit.

The majority of circuit courts that have examined the issue hold that district courts have power to impose Rule 11 sanctions after the plaintiffs have voluntarily dismissed the action. *See, e.g., Danik, Inc. v. Hartmarx Corp.*, 875 F.2d 890, 893–95 (D.C.Cir.), *cert. granted sub nom Cooter & Gell v. Hartmarx Corp.*, — U.S. —, 110 S.Ct. 275, 107 L.Ed.2d 256 (1989); *Muthig v. Brant Point Nantucket, Inc.*, 838 F.2d 600, 603–04 (1st Cir.1988); *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1076–79 (7th Cir.1987) (jurisdiction exists

---

**5.** In view of the disposition of this appeal, we need not address the propriety of the district

court's procedure.

where motion for sanctions under Rule 11 was made after voluntary dismissal of the complaint pursuant to Fed.R.Civ.P. 41(a)(1)); *Kurkowski v. Volcker*, 819 F.2d 201, 203 (8th Cir.1987) (jurisdiction exists where defendants filed motions to dismiss along with a request for sanctions before the voluntary dismissal was filed); *Greenberg v. Sala*, 822 F.2d 882, 885 (9th Cir. 1987) (jurisdiction exists where motion for sanctions under Rule 11 was made after dismissal).

The Second Circuit adheres to the opposite view. *See Johnson Chemical Co. v. Home Care Products*, 823 F.2d 28, 31 (2d Cir.1987); *cf. Santiago v. Victim Services Agency of the Metropolitan Assistance Corp.*, 753 F.2d 219, 221 (2d Cir.1985) (no jurisdiction to enter an order awarding attorneys' fees under 42 U.S.C. § 1988 after voluntary dismissal). The *Johnson* court held that once Johnson had dismissed its action under Rule 41(a)(1)(i), the district court "lost all jurisdiction" over the action and that the order granting sanctions under Rule 11, entered subsequent to the dismissal, was therefore a nullity. *Johnson*, 823 F.2d at 31.

Yet, as Judge Easterbrook observed in *Szabo Food Service*, " 'Jurisdiction' is an all-purpose word denoting adjudicatory power. A court may have power to do some things but not others, and the use of 'lack of jurisdiction' to describe the things it may not do does not mean that the court is out of business." *Szabo*, 823 F.2d at 1077.

For example, a federal court may lack jurisdiction over the subject matter of an action; yet it retains the power to determine its own jurisdiction and engage in the usual judicial acts—supervising discovery, holding trial and ordering payment of costs at the end—though it has no power to decide the merits. If the complaint which commenced the action is too frivolous to create subject matter jurisdiction, the court would retain the power to award attorneys' fees as an incident of costs to discourage vexatious litigation. *Id.* at 1078.

In actions squarely within the subject matter jurisdiction of the federal courts, a district court may nonetheless lose its power to decide the merits. Such is the case after entry of a final judgment (subject to a timely motion under Rules 52, 59 or 60) or while a case is on appeal from a final judgment. *Szabo*, 823 F.2d at 1078.[6] Nonetheless, a district court, after entry of a final judgment and filing of a notice of appeal, retains the power to adjudicate collateral matters such as applications for counsel fees, *West v. Keve*, 721 F.2d 91, 95 n. 5 (3d Cir.1983), and motions for sanctions under Rule 11, *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 98 (3d Cir.1988).

Lastly, a court may lack jurisdiction in the sense that no case or controversy exists. A plaintiff who voluntarily dismisses an action removes himself from the dispute—the dispute vanishes. In some sense, "[i]t is as if the suit had never been brought." *Szabo*, 823 F.2d at 1078. Such analysis has obvious limits, demonstrated most graphically by Judge Easterbrook's hypothetical plaintiff, who at pre-trial conference approaches the bench, punches the judge in the nose and simultaneously tenders a notice of dismissal pursuant to Rule 41(a)(1)(i). Certainly filing the notice cannot insulate the plaintiff from a citation for contempt because "it is as if the action had never been brought."

The analogy of Rule 11 sanctions to contempt proceedings is apt. Both are designed to deter misbehavior before the Court. *See* Fed.R.Civ.P. 11, advisory com-

---

**6.** Schering and Key cite several cases from this category. *See Manze v. State Farm Ins. Co.*, 817 F.2d 1062, 1064–67 (3d Cir.1987); *Foss v. Federal Intermediate Credit Bank of St. Paul*, 808 F.2d 657, 660 (8th Cir.1986). While such cases may support an argument that a court may not retain jurisdiction to decide the merits of a case after a notice of voluntary dismissal has been filed, they certainly cannot be read to mean that a court may not retain jurisdiction to decide collateral matters such as sanctions, contempts and attorneys' fees.

*Williams v. Ezell*, 531 F.2d 1261 (5th Cir. 1976), is slightly different. It appears to hold that, after filing of a notice of voluntary dismissal, a district court not only may not address the merits of an action, it may not entertain applications for attorneys' fees. To the extent that case conflicts with our analysis here, we decline to follow it.

mittee's note ("Since its original promulgation, Rule 11 has provided for the striking of pleadings and imposition of disciplinary sanctions to check abuses in the signing of pleadings"). To hold that a district court has no power to order sanctions after a voluntary dismissal is to emasculate Rule 11 in those cases where wily plaintiffs file baseless complaints, unnecessarily sap the precious resources of their adversaries and the courts, only to insulate themselves from sanctions by promptly filing a notice of dismissal.

We hold the district court had jurisdiction to entertain and decide the Rule 11 motion after defendants suffered a voluntary dismissal under Rule 41(a)(1)(i).

### III.

■ We conclude, however, that imposition of Rule 11 sanctions was not warranted in this case. We review the district court's decision for an abuse of discretion. *See Snow Machines, Inc. v. Hedco, Inc.*, 838 F.2d 718, 724 (3d Cir.1988); *Teamsters Local Union No. 430 v. Cement Express, Inc.*, 841 F.2d 66, 68 (3d Cir.) ("Our review of the imposition or denial of sanctions under Rule 11 is limited to determining whether the district court has abused its discretion"), *cert. denied*, — U.S. —, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988).

Rule 11 provides that every pleading, motion or other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name. The signature of the attorney constitutes a certificate that:

> the signer has read the pleading, motion or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law ... and that it is not interposed for any improper purpose, such as to harass or to cause any unnecessary delay or needless increase in the cost of litigation.

Fed.R.Civ.P. 11.

■ The rule requires a reasonable inquiry into both the facts and the law supporting a particular pleading. We have stressed in two recent cases that proper analysis should focus on the circumstances that existed at the time counsel filed the challenged paper. *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir.1988); *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 484 (3d Cir.1987). The wisdom of hindsight is to be avoided; the attorney's conduct must be judged by what was reasonable to believe at the time the pleading, motion, or other paper was submitted. Fed.R.Civ.P. 11, advisory committee's note; *Pensiero*, 847 F.2d at 94 (3d Cir.1988).

■ Rule 11 sanctions are proper only in situations involving a signed pleading. *Gaiardo*, 835 F.2d at 484; *Cement Express*, 841 F.2d at 68. Although the district court found that the natural import of Schering and Key's written representations was "reinforced" by their oral representations, 124 F.R.D. at 586, only representations contained in signed writings could be a proper basis for Rule 11 sanctions.

The written representations included allegations that substitution of Theochron for Theo–Dur posed "present hazards to the public, for which there is no adequate remedy at law," Complaint at ¶ 21, and several passages in plaintiffs' memorandum in support of their application for an order to show cause, filed September 16, 1988. *See* Memorandum at 5 (substitution presents "clear risk to patients"); Memorandum at 6 (the public interest is particularly significant due to "the risk of harm to the public"); Memorandum at 7–8 ("grave consequences" may follow from mistaken substitution); Memorandum at 9 (defendants' acts create hazards for patients suffering from serious illnesses).

Alfred T. Lee signed the complaint, the memorandum in support of an order to show cause and the supplemental memorandum in support of a preliminary injunction. In response to the motion for sanctions, he filed an affidavit stating that prior to filing the complaint he spent substantial time

> reviewing materials dealing with the matter of drug bioequivalence and particularly as it related to theophylline, in-

cluding the Orange Book, medical journal articles, the transcript of seminars conducted by the FDA and other such documents. I met with, spoke by phone with and read memos of Schering employees with technical knowledge of the relevant facts and FDA procedures and policies.

Affidavit of Alfred T. Lee at ¶ 18, *Schering v. Vitarine* (Civ. No. 88–4046) (filed Jan. 26, 1989).

The record bears him out. On October 19, 1988, Schering and Key submitted a supplemental memorandum in support of a preliminary injunction, attached to which were four articles from medical journals.[7] According to these articles, theophylline's highly toxic nature and the narrow range of concentrations in which it is effective but not toxic (10–20 micrograms of drug per milliliter of blood) were known as early as 1976,[8] long before the complaint was filed on September 16, 1988. The toxic effects of overdose, including convulsions, arrhythmias and death, were detailed in the Theochron package insert, a copy of which was attached as well.

It is not disputed that on the dates the complaint and plaintiffs' memoranda were filed, Theochron had not received an AB rating from the FDA indicating it was bioequivalent to Schering's Theo–Dur in 100 and 200 mg. tablet forms. At that point in time, therefore, Forest/Inwood had not demonstrated by evidence acceptable to the FDA that the rate and extent of absorption of Theochron in the blood over time was substantially equivalent to Schering's Theo–Dur.

In light of the degree to which severe toxic effects—even death—depend on small variations in the concentration of theophyl-line in the blood, the following passage from a standard work on pharmacology might be enough to give a reasonable person pause:

> [T]he rate of [theophylline] absorption varies considerably among different formulations, and changing products after establishing a successful regimen may result in excessive fluctuations in the concentration of theophylline in plasma.

A. Gilman, L. Goodman, T. Rall & F. Murad, Goodman and Gilman's Pharmacological Basis of Therapeutics at 599 (7th ed. 1985). This passage was quoted by Mr. David Pernock in his affidavit filed with the complaint.

Additionally, the four medical articles filed by Schering and Key clearly warn of the risk of adverse health effects from substituting one formulation of sustained-release theophylline for another.

> In conclusion, switching between the same dose of different formulations of SR theophylline resulted in marked changes in serum theophylline concentrations.... [The] formulation-related variability resulted in serum theophylline concentrations that were often far outside the therapeutic range, and these were accompanied by symptoms of toxicity or worsening pulmonary functions in six of ten subjects studied.

Baker, *supra* note 7, at 672.

A reasonable inquiry into the facts would, and indeed did, unearth the medical references submitted by Schering and Key. Based upon them, the written assertions that substitution of Theochron for Theo–Dur had caused and would continue to cause "present hazards to the public" appears to be adequately grounded in fact for purposes of Rule 11.[9]

---

7.  Ballin, *The Real Costs of Generic Substitution,* New York State Journal of Medicine, March 1988, at 121; Klein, *Problems with Generic Theophylline and Indiscriminate Brand Switching,* 58 Annals of Allergy 350 (1987); Baptista & Driscoll, *Theophylline Pharmacotherapy,* American Pharmacy, May 1984, at 57; Baker, Moessner, Gonzalez, Grabenstein, Renard, DeNapoli, Summers & Schuster, *Clinical Relevance of the Substitution of Different Brands of Sustained-Release Theophylline,* 81 J. Allergy & Clinical Immunology 664 (1988).

8.  In reciting these facts, Baker, *supra* note 7, at 671 n. 2, cites an article published in 1976. Similarly, Klein, *supra* note 7, at 350 n. 1, cites an article published in 1973.

9.  Schering and Key also submitted affidavits and declarations from several experts—Drs. Scott E. Thompson, Thomas Q. Garvey, James R. Baker, Jere E. Goyan and Elliot Ellis. Each addresses various aspects of the FDA's approach to bioequivalence ratings and the safety of substituting a drug with a BC rating, like Theo-

We note at the outset that in January of 1989, the FDA granted an AB rating to Theochron in 100 and 200 mg. tablet forms.[10] This information was not available to Schering and Key on the dates they filed their papers and therefore does not diminish the basis for the asserting on those dates that a serious health risk existed.

The district court found that plaintiffs had not submitted any studies showing specifically that Theochron, when substituted for Theo–Dur, produced a serious health risk. Schering and Key were not required to do so by Rule 11. The plaintiffs' submissions, particularly the Baker study, established that substitution of any of several alternate theophylline formulations for Theo–Dur produced a health risk. In the absence of a FDA rating indicating Theochron was bioequivalent to Theo–Dur, it was reasonable for Schering and Key to infer from these studies that unknowing substitution of Theochron for Theo–Dur would also produce a health risk.

Vitarine and Major argue that, despite the medical publications and FDA ratings, Schering and Key knew, on the basis of a study conducted in California in 1986 and 1987, that substitution of Theochron for Theo–Dur posed no health risk. Obviously, Schering and Key could not reasonably assert what they knew to be false. Such is not the case, however.

According to Evan Siegel, Supervising Toxicologist and Chief of the Special Services Unit of the Food and Drug Branch, Environmental Health Division, Department of Health Services for the State of California, Schering–Plough petitioned the California Department of Health Services in 1985, requesting that SR theophylline products of all tablet strengths be placed on California's Formulary of Inequivalent Generic Drug Types and Drug Products ("negative formulary"). Affidavit of Evan Siegel at ¶ 4, *Schering v. Vitarine* (Civ. No. 88–4046) (filed Oct. 19, 1988). In response, the Food and Drug Branch of the Department of Health Services conducted an extensive survey of California physicians to determine whether there was any medical evidence to support allegations of significant adverse reactions due to substitution.[11] The Food and Drug Branch found it impossible to determine if reported adverse effects were due to theophylline substitution or to some other confounding cause. Exhibit D to Affidavit of Evan Siegel, *Schering v. Vitarine* (Civ. No. 88–4046) (filed Oct. 19, 1988). Medical literature was also reviewed and found "inconclusive." *Id.* The study concluded there was insufficient evidence to demonstrate that reports of adverse reactions were at-

chron, for a drug with an AB rating, like Theo–Dur. Each affidavit clearly supports Schering and Key's claim of a serious health risk.

The district court refused to consider them, however, since they were not presented at the October 24, 1988 hearing and, in fact, were not submitted until two and one-half months later in response to Vitarine and Major's sanctions motion. The district court wrote, "Rule 11 mandates that a party have in hand the basis for its factual representations prior to the time it makes those representations. Accordingly, plaintiffs should have had in their possession, prior to the filing of the complaint and the preliminary injunction application, the information contained in the four affidavits." *Schering v. Vitarine*, 124 F.R.D. at 589 n. 8.

We have examined these affidavits, along with the affidavit of Schering counsel Alfred T. Lee, quoted *supra* at 496–97. From these affidavits, it is not at all clear that counsel for Schering communicated with Drs. Scott, Garvey, Baker, Goyan or Ellis prior to filing their papers or, with the exception of Dr. Baker, relied on anything they had written prior to the filing dates. None

of these individuals work for Schering nor, with the exception of Dr. Baker, do their names appear on the journal articles submitted in support of a preliminary injunction. Without some clearer indication that the information contained in the affidavits was relied upon by Schering in filing their papers, we think the district court was entitled to disregard them.

10. *See* Exhibits D & E to the Affidavit of Eric T. Schneiderman, *Schering v. Vitarine* (Civ. No. 88–4046).

11. Nine hundred physicians were sent questionnaires. Exhibit D to the Affidavit of Evan Siegel, *Schering v. Vitarine* (Civ. No. 88–4046) (filed Oct. 19, 1988). One hundred forty-seven replied, fifty-six (thirty-eight percent) of whom indicated they had encountered significant patient reactions resulting from interchanging SR theophylline products. *Id.* Follow-up interviews were conducted with seventy-four of the respondents, forty-one of whom had noted adverse reactions. *Id.*

tributable to substitution of different SR theophylline formulations. *Id.* Accordingly, the Food and Drug Branch declined to place SR theophylline drugs on California's negative formulary. *Id.*

The district court noted in its opinion that this study neither proved nor disproved the risk of substituting theophylline formulations. 124 F.R.D. at 588. Although Schering instigated this study and knew that it failed to produce proof of a health risk, the study is inconclusive. It does not nullify the articles and other evidence upon which Schering relied in asserting that a serious health risk existed.

■ Vitarine and Major submitted affidavits from Dr. Leonard Lachman, Medical Director of Forest/Inwood Laboratories, stating that (1) none of the four medical reports submitted by plaintiffs studied the effect of substituting Theochron for Theo–Dur, (2) to the best of his knowledge, there were no documented cases of therapeutic failure due to substitution of Theochron for Theo–Dur and (3) the California study failed to find any medically confirmable evidence of therapeutic failure due to such substitutions. *See* Affidavit of Leonard Lachman, *Schering v. Vitarine* (Civ. No. 88–4046); Supplemental Affidavit of Leonard Lachman, *Schering v. Vitarine* (Civ. No. 88–4046). As discussed above, Schering and Key could reasonably infer from medical journal articles and published FDA ratings that substitution of Theochron for Theo–Dur would result in a serious risk to patients' health. Neither the California study nor Dr. Lachman's affidavits nullify the basis for that inference. Doubtless, the affidavits submitted by Vitarine and Major contradict Schering's assertions of health hazards. Such affidavits would cer-

tainly prevent plaintiffs from prevailing on a motion for summary judgment. A conflict of opinion should not, however, be the basis for assessing sanctions. "Nothing in the language of the Rule or the Advisory Committee Notes supports the view that 'the Rule empowers the district court to impose sanctions on lawyers simply because a particular argument or ground for relief contained in a non-frivolous motion is found by the district court to be unjustified.'" *Gaiardo*, 835 F.2d at 483.

Vitarine and Major note that Schering and Key waited five months after they discovered Murray's advertising to file the complaint. The delay, in Vitarine and Major's view, shows that the "serious health risk" argument was a pretext. No one, they argue, would wait so long if a serious health risk existed in fact.

The short answer is that the medical articles, the FDA ratings, the Goodman and Gilman treatise, and so on, gave Schering and Key a reasonable basis for assertions of serious health risk. That they waited so long to file the complaint—apparently for no better reason than vacation time for lawyers [12]—is deplorable, but it does not eradicate the basis for the assertions.

Vitarine and Major also note that the FDA strongly criticized Schering for employing false and misleading claims on a continuing basis in promoting Theo–Dur. FDA Notice of Adverse Findings at 1, attached as Exhibit F of the Affidavit of Eric T. Schneiderman, *Schering v. Vitarine* (Civ. No. 88–4046). In particular, the FDA found that Schering had begun a misleading promotional campaign based on the Baker study. Notice of Adverse Findings at 4. Schering claimed in their promotional

---

**12.** Emil Scheller, Director of Trademarks and Copyrights for Pharmaceuticals Operations of Schering–Plough Corporation, stated in a deposition some of the reasons for the delay. Scheller was aware of Murray's ads by April 25, 1988. App. at 481–482. Suit was not commenced until September 16, 1988. According to Scheller, the suit had to be authorized by management, then papers had to be reviewed and revised. App. at 485.

The suit was presented to the vice presidents of the two groups involved, then to the presi-

dent of the division. An impact statement then was prepared and presented to the general counsel. The general counsel might have had to consult with the executive vice president of administration. App. at 485–86. Suit was finally authorized and the matter referred to Milgrim Thomajan before Scheller left for Europe, App. at 498, which was the beginning of June or July. App. at 494. Mr. Rosen was on vacation from July 7 to August 8, and from September 3 to September 10, which was a major source of delay. App. at 500.

materials, as they did here, that the Baker study showed substituting other SR theophylline products for Theo–Dur entailed considerable hazard to patients. *Id.* Schering failed to mention in these promotional claims that the Baker study tested only "B" rated SR theophylline products. *Id.* However, products were available with "A" ratings, were considered by the FDA to be therapeutically equivalent, and were not included in the study. *Id.* Schering's open-ended assertion that no other product could be safely substituted for Theo–Dur was therefore misleading with respect to "A" rated products. *Id.*

The FDA's adverse findings have no effect on our decision. At the time Schering filed the papers challenged here, Theochron had a species of "B" rating—namely a BC rating. It was not until some time later, in January of 1989, that Theochron received an AB rating. Thus, at the time the papers were filed, the Baker study provided firm ground for asserting that substitution of Theochron, a BC rated product, for Theo–Dur would pose a serious health risk to patients.

We conclude that Schering and Key, prior to filing the various papers in this action, adequately investigated the factual basis for their written assertions of health risks. The medical journal articles, the FDA ratings, the Goodman and Gilman treatise and the package insert provide a sufficient factual basis from which Schering and Key could reasonably infer that substitution of Theochron for Theo–Dur in the 100 and 200 mg. tablet strengths entailed a serious risk to patients' health.

The district court abused its discretion in imposing sanctions in this circumstance.

We would think differently if it were shown that Schering and Key filed papers to harass a successful competitor. The district court wrote, however, that while it had "an abiding sense" that such might be the case, it did not find that this suit was brought for harassment purposes. *Schering v. Vitarine,* 124 F.R.D. at 590 n. 11. Nor does our review of the record reflect evidence to sustain such a charge.[13]

We will reverse. Each party to bear its own costs.

---

**13.** Vitarine and Major argue the FDA's Notice of Adverse Findings show that Schering has embarked on a campaign to spread false and misleading information about generic theophylline. Whether that is true or not, it does not establish that this particular suit was brought to harass.

The five month delay in filing the complaint might be evidence that Schering and Key used the health risk argument as a mere pretext for filing a harassment suit. The district court did not so find, however, and we do not find its decision clearly erroneous.

Vitarine and Major also argue that Schering and Key pursued discovery and a preliminary injunction long after Murray ceased advertising Theochron as bioequivalent to Theo–Dur. This

argument ignores the trademark infringement claims unrelated to bioequivalence, for which a preliminary injunction might validly be sought.

Vitarine and Major argue that we should affirm the district court's order on the basis of 28 U.S.C. § 1927. Since the district court did not grant sanctions under this section and Vitarine and Major did not cross-appeal, the issue is not properly before us. For the same reason, we need not decide whether sanctions under Rule 11 would be proper because Schering and Key had no basis in fact or law for asserting that Vitarine and Major were vicariously liable for the acts of Murray Drug Corporation or that personal jurisdiction existed over Major in New Jersey.